**Paul SIMMONS, et al., Plaintiffs**

v.

**William F. GALVIN, Defendant.**

**C.A. No. 01–11040–MLW.**

United States District Court,
D. Massachusetts.

Aug. 30, 2007.

Abdur Bashir Nadheerul–Islam, pro se.

Mark B. Dubnoff, Nicholas J. Rosenberg, Thomas W. Kirchofer, Steven M. Cowley, Edwards Angell Palmer & Dodge LLP, Boston, MA, for Plaintiffs.

Peter Sacks, Romeo G. Camba, Kenneth W. Salinger, Attorney General's Office, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

Plaintiffs Paul Simmons, Pedro Valentin, and Dennis J. Beldotti seek relief from

William Galvin, Secretary of The Commonwealth of Massachusetts, in his official capacity.[1] The plaintiffs complain that, by the passage of Amendment CXX to the Massachusetts Constitution, Mass. Const. art. CXX, and Chapter 150 of the Acts of 2001, Mass. St. 2001, c. 150, M.G.L. c. 51, § 1, they were wrongfully denied their right to vote in federal and state elections.

Article CXX and Chapter 150 disqualify incarcerated felons from voting in all elections held in the Commonwealth. The plaintiffs, who were convicted prior to these acts, contend that this disenfranchisement violates the Ex Post Facto Clause of the United States Constitution because it imposes an additional penalty for the crimes for which they were previously convicted and sentenced. They also assert that article CXX and Chapter 150 violate the Equal Protection Clause of the Fourteenth Amendment. Finally, they allege that the disenfranchisement of imprisoned felons has a disproportionate effect on African–American and Hispanic–American voters in Massachusetts. They contend that this disparate effect is caused, in part, by a racially discriminatory court system, and operates to deny African–American and Hispanic–American voters the equal right to vote in violation of § 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973(b).

The defendants have moved for summary judgment on the first two claims and for judgment on the pleadings concerning the third. Hearings on the motions were held on April 13 and 18, 2007.

Defendant's motion for summary judgment is being granted. The Ex Post Facto Clause prohibits the imposition of punishments that were not prescribed at the time a crime was committed. However, article CXX and Chapter 150 were intended to be civil, non-punitive measures for the regulation of the franchise. Therefore, to succeed on their Ex Post Facto claim the plaintiffs must demonstrate by clear proof that the effect of article CXX and Chapter 150 is primarily punitive. They have failed to produce the proof necessary to transform what was manifestly intended to be a civil, regulatory measure into a criminal penalty for the purpose of Ex Post Facto Clause analysis.

In addition, it is well-established that a state may disenfranchise felons without violating the Equal Protection Clause of the Fourteenth Amendment. Only a rational basis is needed to do so. A state may rationally decide that those who have violated the laws are not fit to participate in electing those who make and enforce the law. The Supreme Court has held that disenfranchising felons who have been released from prison does not violate the Equal Protection Clause. It is even more reasonable to disenfranchise felons who are incarcerated.

The defendant's motion for judgment on the pleadings on the plaintiffs' VRA claim recognizes that, because there has been no discovery, a motion for summary judgment would be premature. Contrary to the defendant's contentions, the plaintiffs have stated a claim for which relief may be granted if the facts alleged are proven. More specifically, the VRA is constitutional as applied to felon disenfranchisement laws. Such laws may violate § 2 of the VRA. The facts alleged in the Second Amended Complaint are sufficient to give the defendant the required notice and state a plausible claim on which relief may be granted if those alleged facts are prov-

---

1. In another case that has been consolidated for pretrial purposes *pro se* plaintiff Abdur Bashir Nadheerul Islam makes claims that are identical to those asserted by the plaintiffs in this case.

en. Therefore, plaintiffs are entitled to discovery on their VRA claim.

## II. BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Article III of the Massachusetts constitution establishes the voting requirements for enumerated state elections. Mass. Const. amend. art. III.[2] This provision was amended by the December 6, 2000 enactment of article CXX, which disqualifies incarcerated felons from voting in specified elections. Mass. Const. art. CXX.[3] Subsequently, the Massachusetts legislature enacted Chapter 150, which broadens felon disenfranchisement to include all elections in the Commonwealth. M.G.L. c. 51, § 1.[4]

By law, a constitutional amendment initiated by a legislator must be approved by two successive joint sessions of the Massachusetts legislature and then ratified by the voters of the Commonwealth. Mass. Const. art. 49, Init., pt. IV, §§ 2–5. Between 1988 and 1997, several state legislators attempted unsuccessfully to invoke this process to enact some form of felon disenfranchisement. See, e.g., H. 5468, 1988(Ma.). In 1997, Representative Francis Mariani introduced a felon disenfranchisement bill which failed in committee. However, it did not die.

Within a few months of the committee vote, The Boston Globe reported that Massachusetts prisoners were planning to form their own political action committee. See Zachary R. Dowdy, Prisoners Forming Mass. PAC, The Boston Globe, August 2, 1997, available at 1997 WLNR 2363144. Governor Paul Cellucci reacted promptly, stating: "When you sentence someone to

2. As amended in 2000, the article provides:

Every citizen of eighteen years of age and upwards, excepting persons who are incarcerated in a correctional facility due to a felony conviction, and, excepting persons under guardianship and persons temporarily or permanently disqualified by law because of corrupt practices in respect to elections who shall have resided within the town or district in which he may claim a right to vote, six calendar months next preceding any election of governor, lieutenant governor, senators or representatives, shall have a right to vote in such election of governor, lieutenant governor, senators and representatives; and no other person shall be entitled to vote in such election.
Mass. Const. amend. art. III.

3. The article provides:

Article III of the Amendments to the Constitution, as amended, is hereby further amended by inserting after the word "upwards" the following words:—", excepting persons who are incarcerated in a correctional facility due to felony conviction, and."
Mass. Const. Art. CXX.

4. The statute, as amended, states:

Every citizen eighteen years of age or older, not being a person under guardianship or incarcerated in a correctional facility due to a felony conviction, and not being temporarily or permanently disqualified by law because of corrupt practices in respect to elections, who is a resident in the city or town where he claims the right to vote at the time he registers, and who has complied with the requirements of this chapter, may have his name entered on the list of voters in such city or town, and may vote therein in any such election, or except insofar as restricted in any town in which a representative town meeting form of government has been established, in any meeting held for the transaction of town affairs. Notwithstanding any special law to the contrary, every such citizen who resides within the boundaries of any district, as defined in section one A of chapter forty-one, may vote for district officers and in any district meeting thereof, and no other person may so vote. No person otherwise qualified to vote for national or state officers shall, by reason of a change of residence within the commonwealth, be disqualified from voting for such officers in the city or town from which he has removed his residence until the expiration of six months from such removal.
M.G.L. c. 51, § 1.

prison, they lose their liberties for a reason[.] * * * Prison is suppose to mean punishment, not some opportunity to form a political group." Richard Chacon, Cellucci Plans Ban On Inmates' Voting, *The Boston Globe*, August 3, 1997, *available at* 1997 WLNR 2364658.

The Governor then proposed a constitutional amendment that would disenfranchise all incarcerated individuals, whether felons or misdemeanants. *See* Letter from Argeo Paul Cellucci, Governor, Massachusetts, to Massachusetts Senate and House of Representatives (August 12, 1997). In support of his amendment, the Governor stated that:

> The time has come to tell would-be criminals in Massachusetts that committing crimes has serious consequences, not only in terms of prison time, but also in terms of the right to participate in deciding how society should be run.

> Criminals behind bars have no business deciding who should govern the law-abiding citizens of the Commonwealth. This proposed amendment will ensure that criminals pay their debt to society before they regain their right to participate in the political process.

*Id.*

While the legislature did not vote on the Governor's proposed amendment, it incorporated its text into the bill previously rejected by committee. With one alteration—the legislature struck the misdemeanant provision—the amendment was approved by both the 1998 and 2000 joint sessions of the legislature.

The law required that the proposed constitutional amendment then be presented to the voters. Mass. Const. art. 49, Init., pt. IV, §§ 2–5. The Secretary of State distributed an Information for Voters guide, which stated in reference to article CXX:

> When someone in Massachusetts is sentenced to jail for committing a felony, we deprive them of their liberty and right to exercise control over their own lives, yet current law allows these same criminals to continue to exercise control over our lives by voting from prison. This amendment will change th[at] law[.]

2000 Information for Voters.

This statement was written by Representative Marini, who sponsored the 1997, failed amendment. It echoed the rationale he presented at the 1998 and 2000 Constitutional Convention. *See* July 29, 1998 Tr. of Constitutional Convention at 28; Feb. 28, 2000 Tr. of Constitutional Convention at 7–8. One other legislator expressed a similar view. *See* July 29, 1998 Tr. of Constitutional Convention at 23.

During the constitutional debate, other legislators made relevant remarks. Representative Paul Frost opined that "people who've committed murder and other heinous crimes * * * don't deserve to vote." July 29, 1998 Tr. of Constitutional Convention at 18. He added, "[t]his is an issue about justice." Feb. 28, 2000 Tr. of Constitutional Convention at 17. Senator Guy Glodis argued that "philosophically, no inmates deserve the right to vote." Feb. 28, 2000 Tr. of Constitutional Convention at 17.

The voters ratified article CXX in 2000. Article CXX took effect on December 6, 2000. In 2001, the legislature enacted Chapter 150.

In their Second Amended Complaint, the plaintiffs allege: (1) that article CXX has "a disproportionately adverse effect on the voting rights of African–American and Hispanic–Americans," ¶¶ 51, 52; (2) that such disproportionate effect "is caused by, among other things, the facts that African–American and Hispanic–Americans are over-represented in the population of Massachusetts incarcerated felons," *id.;*

(3) "that there exists considerable racial and ethnic bias, both direct and subtle, in the Massachusetts court system," *id.;* (4) that there is a causal link between the overrepresentation of minorities in the incarcerated felon population and the racial and ethnic bias in the Massachusetts court system, *id.;* and (5) that lawmakers were aware of the possibility of bias in the Massachusetts court system prior to the passage of article CXX because of, among other things, the publication of the 1994 Final Report of the Massachusetts Commission to Study Racial and Ethnic Bias in the Courts, *id.* at ¶¶ 21–22.

The parties stipulated, and the court agreed, that a class action is unnecessary in this matter because the defendant will, in the event of judgment for the plaintiffs, restore voting rights to all persons who would have benefitted by a ruling in a class action. *See* Jan. 29, 2003 Order.

In addition, since the issues are identical, it is only necessary to analyze the questions presented concerning article CXX. The analysis is equally applicable to Chapter 150.

## III. ANALYSIS

### A. *Ex Post Facto Clause*

The plaintiffs contend that article CXX violates the Ex Post Facto Clause because it imposes an additional penalty—disenfranchisement—for the crimes which they committed before enactment of the constitutional amendment. The Ex Post Facto Clause states that, "No State shall ... pass any ... ex post facto Law." U.S. Const. art. 1, § 10. It "bars application of a law 'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed[.]'" *Johnson v. United States,* 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (*quoting Calder v. Bull,* 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798)).

██ Under the Ex Post Facto Clause, the court must engage in a two-step analysis of a challenged law. First, it examines the act to determine whether the legislature intended it to be punitive. *See Smith v. Doe,* 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (*citing Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). Where the court finds such intent, the inquiry is at an end. *Id.* However, where the act evinces a legislative intent to establish a civil, nonpunitive, regulatory scheme, the court must ensure that the scheme is not "so punitive either in purpose or effect as to negate [the state's] intention to deem it civil." *Id.* (internal quotation marks and citations omitted). "Because [a court] ordinarily defers to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (internal quotation marks and citations omitted).

██ "Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" *Smith,* 538 U.S. at 92, 123 S.Ct. 1140 (*quoting Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072). In construing a statute, a court must "consider the statute's text and its structure to determine the legislative objective." *Id.* "[I]n all statutory construction cases, [the court must] begin with the language of the statute.'" *Phillips v. Pembroke Real Estate, Inc.,* 459 F.3d 128, 139 (1st Cir.2006) (*quoting Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002)). Statutory language is accorded "its ordinary meaning by reference to the specific context in which the language is used, and the broader context of the statute as a whole. If the statutory language provides a clear answer, the inquiry ends." *United States v. Roberson,* 459

F.3d 39, 51 (1st Cir.2006) (internal quotation marks and citations omitted). "[T]he congressional intendment conveyed by unclear statutory language may be discernible from its legislative history." *Rolland v. Romney,* 318 F.3d 42, 48 (1st Cir.2003) (internal quotation marks and citations omitted). The task of construing a statute involves reaching a conclusion of law rather than making a finding of fact. *See United States v. Jones,* 10 F.3d 901, 904 (1st Cir.1993).

As explained below, article CXX manifests the legislature's intent to enact a civil, nonpunitive, regulatory requirement, and there is not the clear proof necessary for the court to override the legislature's intent and treat the provision as a criminal penalty. Therefore, the defendant is entitled to summary judgment on plaintiffs' Ex Post Facto Clause claim.

The legislature, through the text and structure of article CXX, expressed an intent to enact civil requirements for voting. Article CXX amended article III of the Massachusetts constitution. Article III states the Commonwealth's voting requirements and makes no reference to penal purposes. Regulations concerning eligibility to vote are within the civil powers of the states. The Supreme Court has written that previous criminal record is an "obvious" factor that "a State may take into consideration in determining the qualifications of voters." *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). The plaintiffs contend that little weight should be given to the placement of article CXX in a civil section of the Massachusetts constitution because the legislature was required to amend Article III to enact a felon disenfranchisement law. However, as in *Smith* and *Hendricks,* " 'nothing on the face of the [amendment] suggests that the legislature sought to create anything

other than a civil. scheme[.]' " *Smith,* 538 U.S. at 93, 123 S.Ct. 1140 (*quoting Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072).

Moreover, the legislative history of article CXX does not persuade the court that it should be construed as creating a criminal penalty. The Supreme Court has "recognized [ ] any statute decreeing some adversity as a consequence of certain conduct may have both a penal and nonpenal effect." *Trop v. Dulles,* 356 U.S. 86, 96, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). At best, the statements prior to the legislature's approval of the amendment reflect the potential hybrid nature of any felon disenfranchisement law. For example, Governor Cellucci's statements quoted earlier include "prison is supposed to mean punishment," which suggests a punitive purpose, and "[c]riminals behind bars have no business deciding who should govern the law-abiding citizens of the Commonwealth," which is a classic statement of the recognized civil, regulatory purpose of felon disenfranchisement laws. *See Trop,* 356 U.S. at 96–7, 78 S.Ct. 590; *Green v. Bd. of Elections of the City of New York,* 380 F.2d 445, 449–50 (2d Cir.1967).

The Information for Voters guide explained that the proposed constitutional amendment would change the law that "allows [ ] criminals to continue to exercise control over our lives by voting from prison." This expresses a civil, regulatory purpose. *Id.* There is no language in the guide that indicates that the proposed amendment had a punitive purpose. As the constitutional amendment required voter ratification, that guide is particularly meaningful legislative history. It does not contradict the conclusion concerning statutory intent that the court discerns from the express language of the amendment when viewed in the context in which it is used. Therefore, the court concludes that the amendment was intended to be pri-

marily civil and regulatory, rather than punitive, in nature.[5]

Judge Rya Zobel of this District Court reached the same conclusion in addressing Chapter 150, the statutory provision at issue in the instant case. As she wrote:

> The statute, as a whole, makes clear that the legislature exercised its broad mandate to regulate voting qualifications and not to punish anyone. Persons under guardianship, persons disqualified because of corrupt elections practices, and all persons under 18 years of age are included among those disenfranchised, in addition to incarcerated felons. All of these excluded persons implicate rational choices: persons under guardianship are in some manner disabled from making choices implicit in voting; persons who have corrupted the election process have shown their contempt therefor and their disregard of the imperative that it be honest and accurate; and incarcerated felons are disqualified during the period of their imprisonment when election officials may have difficulty identifying their address and ensuring the accuracy of the ballot.

*King v. Boston,* No. 05–10156, 2004 WL 1070573 (D.Mass. May 13, 2004), at *1.

As article CXX is regulatory on its face, the court must next determine whether its actual purpose or effect is to impose punishment. *See Smith,* 538 U.S. at 92, 123 S.Ct. 1140. As described earlier, where the legislature has indicated a preference for one label over another, the plaintiff must provide "the clearest proof [to] override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92, 123 S.Ct. 1140 (internal quotation marks and citation omitted).

To determine the actual effect of article CXX, the court must analyze the seven factors described in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *See Smith,* 538 U.S. at 97, 123 S.Ct. 1140. As the *Mendoza–Martinez* factors are designed for various constitutional contexts, they are "neither exhaustive nor dispositive[;]" rather, they are "useful guideposts." *Id.* The *Mendoza–Martinez* factors most relevant to this case "are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.*

In *Smith,* the Supreme Court reviewed a grant of summary judgment for the state. *Id.* at 91, 123 S.Ct. 1140. It applied these factors and found Alaska's sex offender registry not to be penal for the purposes of the Ex Post Facto Clause analysis. *Id.* at 97–105, 123 S.Ct. 1140. It reasoned first that there was no connection between the registration requirement and sanctions that had historically been regarded in the United States as punitive. *Id.* at 97, 123 S.Ct. 1140. In the instant case, the plaintiffs also fail to establish that disenfranchisement has been traditionally understood in our country to be punishment.

In *Trop,* the Supreme Court used felon disenfranchisement laws as the example of statutes that are traditionally regarded as primarily civil despite the fact that they may also have a penal effect. It explained:

---

**5.** Even if the legislative history is viewed as conflicting, "legislative history that itself is inconclusive will rarely, if ever, overcome the words of a statute." *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 698 (1st Cir.1994).

In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment-that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature. The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.

*Trop*, 356 U.S. at 95–96, 78 S.Ct. 590; *see also id.* at 124, 78 S.Ct. 590; (Frankfurter, J., dissenting) ("loss of civil rights as a result of conviction for a felony" is not a " 'punishment' for any legally significant purpose." (*citing* James A. Gathings, *Loss of Citizenship and Civil Rights for Conviction of Crime*, 43 Am. Pol. Sci. Rev. 1228, 1233 (1949))). In finding that a felon disenfranchisement law was not punitive and, therefore, not an unconstitutional bill of attainder, the Second Circuit noted that, in *Trop*, "the Chief Justice used statutes depriving felons of voting rights to illustrate

what was not a penal law." *Green*, 380 F.2d at 449.

To support their argument that felon disenfranchisement laws have been traditionally regarded as punitive, the plaintiffs rely on an article by Professor Mirjan R. Damaska, *Adverse Legal Consequence of Conviction and their Removal: A Comparative Study*, 59 J. Crim. L. Criminology & Police Sci. 347, 351 (1968). Professor Damaska writes that felon disenfranchisement laws have historically been regarded as punitive in many countries other than the United States. *Id.* at 352–54. Relying on this article, the Second Circuit, sitting *en banc*, wrote that the imposition of disenfranchisement as a criminal penalty extends back to ancient Athens and through the Roman Republic, Medieval England, Nineteenth Century Continental Europe, Colonial America, and the Early American Republic. *See Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir.2006). Similarly, the Eleventh Circuit, sitting *en banc*, noted that "throughout history, criminal disenfranchisement provisions have existed as a punitive device" and that such provisions "are punitive devices stemming from criminal law." *Johnson v. Bush*, 405 F.3d 1214, 1218 n. 5, 1228 (11th Cir.2005) (*citing Recent Developments: One Person, No Vote: The Laws of Felon Disenfranchisement*, 115 Harv. L. Rev. 1939, 1939–42 (2002)).

However, Professor Damaska's article does not discuss the experience in the United States. Therefore, it does not address whether felon disenfranchisement "has been regarded in *our* history and traditions as a punishment." *Smith*, 538 U.S. at 97, 123 S.Ct. 1140 (emphasis added). Moreover, the quoted statements by the Second and Eleventh Circuit in *Hayden* and *Johnson* are dicta. Neither *Hayden* nor *Johnson* required resolution of the question of whether a felon disenfranchisement law was penal or regulatory. Rath-

er, *Hayden* and *Johnson* were VRA cases and the historical references to the disenfranchisement of felons were only relevant to whether Congress intended to subject felon disenfranchisement to the requirements of the VRA given its long history. *See Hayden,* 449 F.3d at 316; *Johnson,* 405 F.3d at 1218.

Most significantly, as described earlier, in 1968 the Supreme Court characterized felon disenfranchisement laws as traditional civil regulations of the right to vote. *See Trop,* 356 U.S. at 96–97, 78 S.Ct. 590. There is no evidence of any material change in this traditional view since 1968. Therefore, this court is guided by the dicta in *Trop* and concludes that in the United States felon disenfranchisement laws have traditionally been regarded as civil, regulatory measures rather than as punitive.

With regard to the second *Mendoza–Martinez* factor, like the sex offender registration requirement at issue in *Smith,* felon disenfranchisement "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith,* 538 U.S. at 99–100, 123 S.Ct. 1140.

Moreover, there is no evidence that felon disenfranchisement is connected materially to other traditional aims of punishment such as deterrence and retribution. While disenfranchisement might have some deterrent effect, "[a] ny number of governmental programs might deter crime without imposing punishment." *Id.* at 102, 123 S.Ct. 1140. " 'To hold that the mere presence of a deterrent purpose renders such government's ability to engage in effective regulation.' " *Id.* (*quoting Hudson v. U.S.,* 522 U.S. 93, 105, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)).

There is also no indication that the disenfranchisement of incarcerated felons has the purpose or material effect of serving the criminal law's goal of satisfying the need for retribution. "Retribution is: 'one of the purposes of punishment, [ ] satisfying the instinct of retaliation and revenge, which naturally arises in a victim, but also to a considerable extent in society generally. It may be deemed controlled and regularized vengeance exacted by society.' " *United States v. Sampson,* 300 F.Supp.2d 275, 277–278 (D.Mass.2004) (*quoting* David M. Walker, *The Oxford Companion to Law* 1068 (1980)). Just as any governmental program might deter crime without imposing punishment, *Smith,* 538 U.S. at 102, 123 S.Ct. 1140, any marginal retributive effect of felon disenfranchisement does not render it, or contribute to rendering it, punishment.

The Supreme Court deems the relationship of a law to legitimate regulatory purposes the " 'most significant' factor in [its] determination that the statute's effects are not punitive." *Smith,* 538 U.S. at 102, 123 S.Ct. 1140. Here, disqualifying those who are imprisoned from voting is rational. As explained by Judge Henry Friendly:

> A man who breaks the laws he has authorized his agent to make for his own governance could fairly [be] thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases.

*Green,* 380 F.2d at 451 (footnote omitted).

Indeed, there is a particularly strong regulatory reason to exclude incarcerated felons from voting. Democracy is a participatory and collegial process. Although

we have a representative democracy, we continue to honor the ideal of ancient Athens, which as Pericles described it:

> differ[ed] from other states in regarding the man who holds aloof from public life not as "quiet" but as "useless;" we decide or debate, carefully and in person, all matters of policy, holding, not that words and deeds go ill together, but that acts are foredoomed to failure where undertaken undiscussed.

Alfred Zimmern, *The Greek Commonwealth* 206 (1956). Prisoners have limited access to information and little opportunity to discuss issues with individuals who are not also being punished for breaking the law. Therefore, it is rational and reasonable to exclude prisoners from voting.

Finally, the regulatory scheme at issue here necessarily applies only to past, criminal conduct. As such, the two "remaining *Mendoza–Martinez* factors—whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime—are of little weight in this case." *Smith*, 538 U.S. at 105, 123 S.Ct. 1140.

In summary, in *Smith*, 538 U.S. at 92, 123 S.Ct. 1140, the Supreme Court stated the precise test to be applied to Ex Post Facto Clause challenges to laws which prohibit felons from voting. Where, as here, the manifest intention of the provision at issue is to establish a civil, regulatory scheme and there is not clear proof that the effect of that scheme is punitive, that law cannot be deemed punitive. *Id.* As article CXX is not punitive, it is not subject to the prohibition of the Ex Post Facto Clause.

### B. *The Equal Protection Clause*

■ Plaintiffs also argue that article CXX violates the Equal Protection Clause of the Fourteenth Amendment because it makes an irrational distinction between incarcerated felons on the one hand and incarcerated misdemeanants, felons who have served their sentence, and the general population on the other. The defendant is entitled to summary judgment on this claim as well.

■ In *Richardson v. Ramirez*, 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), the Supreme Court held that because felon disenfranchisement is specifically referenced in § 2 of the Fourteenth Amendment, laws disqualifying felons who have served their sentence are not subject to strict scrutiny. Therefore, laws disenfranchising felons do not violate the Equal Protection Clause of the Fourteenth Amendment if there is a rational basis for them. *See Owens v. Barnes*, 711 F.2d 25, 27 (3rd Cir.1983); *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir.1978). Rational basis review requires only that government action correlate to a legitimate governmental interest. *See PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 31–32 (1st Cir.1991).

Once again, "it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce them, the prosecutors who try them for further violations, or the judges who are to consider their cases." *Green*, 380 F.2d at 451. In *Richardson* the Supreme Court held that prohibiting felons who had been released from prison from voting did not violate the Equal Protection Clause of the Fourteenth Amendment. 418 U.S. at 56, 94 S.Ct. 2655. It is even more reasonable to disenfranchise felons who are imprisoned and, therefore, are not deemed to have been rehabilitated and are not able to participate fully in the collegial process of preparing to vote. It is also rational to disqualify imprisoned felons from voting,

while allowing incarcerated individuals who have committed only misdemeanors—which are less serious offenses—to retain the franchise. Therefore, article CXX does not violate plaintiffs' rights to Equal Protection.

## C. *The Voting Rights Act*

The defendant has moved for judgment on the pleadings on plaintiffs' claim that article CXX violates the VRA. There are several bases for this contention. First, the defendant asserts that the constitution exempts felon disenfranchisement from the wide range of schemes that can be prohibited by statute if they are racially discriminatory unless they were motivated by a discriminatory intent. Second, he contends that the VRA is not intended to cover felon disenfranchisement laws. Third, the defendant argues that if the VRA is intended to include such laws it is unconstitutional because Congress did not make the necessary findings that felon disenfranchisement is often a pretext for racial discrimination. Finally, the defendant claims that even if the VRA permissibly prohibits felon disenfranchisement laws in certain circumstances, the Second Amended Complaint in this case fails to state a claim on which relief may be granted.

The issues presented concerning the VRA have divided the circuits that have addressed them, two on motions for summary judgment and the third on a motion for judgment on the pleadings. *Compare Farrakhan v. Washington*, 338 F.3d 1009 (9th Cir.2003) (reversing a grant of summary judgment for the state and finding VRA's plain text prohibits racially discriminatory felon disenfranchisement laws), *with Johnson*, 405 F.3d at 1217 (addressing a motion for summary judgment and finding VRA does not cover felon disenfranchisement laws), *and Hayden*, 449 F.3d at 309 (addressing a motion for judg-ment on the pleadings and finding that the VRA does not cover felon disenfranchisement laws). As explained below, this court agrees with the Ninth Circuit and the four dissenters in the Second Circuit that felon disenfranchisement laws are covered by the VRA and that the VRA is constitutional as applied to them. This court also finds that the allegations of the Second Amended Complaint are sufficient to state a VRA claim on which relief can be granted.

Defendant's constitutional and statutory arguments rely heavily on the reference to felon disenfranchisement in the Fourteenth Amendment. Section 2 of the Fourteenth Amendment provides, in part, that when a state denies right to vote to any citizen for participation in a "crime, the basis of representation [of that state in Congress] shall be reduced by that portion which the number of such [ ] citizens shall bear to the whole number of [ ] citizens . . . in such State." Focusing on this provision, the Eleventh Circuit stated:

> As the Court explained in *Richardson*, "the exclusion of felons from the vote has an affirmative sanction in section 2 of the Fourteenth Amendment, a sanction which was not present in the case of the restrictions on the franchise which were invalidated [in other cases]." 418 U.S. at 54, 94 S.Ct. 2655. Thus, interpreting Section 2 of the Voting Rights Act to deny Florida the discretion to disenfranchise felons raises serious constitutional problems because such an interpretation allows a congressional statute to override the text of the Constitution.

> It is a long-standing role of statutory interpretation that federal courts should not construe a statute to create a constitutional question unless there is a clear

statement from Congress endorsing this understanding.

*Johnson,* 405 F.3d at 1228–29.

The defendant here makes a similar argument. He recognizes that after *Richardson,* in a case alleging violation of 42 U.S.C. § 1983, the Supreme Court held that "[VRA] § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [an Alabama felon disenfranchisement law] which otherwise violates § 1 of the Fourteenth Amendment." *Hunter v. Underwood,* 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *see also Hayden,* 449 F.3d at 349 (Parker, J., dissenting). Therefore, the defendant asserts that "although the Fourteenth and Fifteenth Amendments restricted the power of States to limit who is eligible to vote, they reserved to the States the power to disenfranchise felons so long as the disenfranchisement law was not adopted with racially discriminatory intent." Def.'s Mem. In Supp. of Mot. for J. at 28. Thus, defendant argues that if the VRA was intended to reach more than felon disenfranchisement laws enacted with discriminatory intent it would be unconstitutional and, therefore, the statute should not be construed to do so.

This contention, however, is not meritorious, essentially because it overlooks the Fifteenth Amendment. The Fifteenth Amendment directly addresses voting. It provides in § 1 that the right of "citizens . . . to vote shall not be denied or abridged by . . . any State on account of race. . . ." Section 2 provides that "[t]he Congress shall have power to enforce this article by appropriate legislation."

■ As explained by Judge Barrington Parker in his dissent in *Hayden:* "Congress's enforcement powers under the Fourteenth and Fifteenth Amendment overlap in certain areas. Nevertheless, the Fifteenth Amendment provides a separate, distinct source of congressional power to regulate racially discriminatory voting restrictions." 449 F.3d at 350. "[T]he Fifteenth Amendment was enacted, among other reasons, precisely because the Fourteenth Amendment—including § 2—did not prohibit states from disenfranchising Blacks." *Id.* at 352. The VRA was enacted, in part, pursuant to Congress' power under the Fifteenth Amendment. *See Chisom v. Roemer,* 501 U.S. 380, 383, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Hayden,* 449 F.3d at 349 (Parker, J., dissenting).

■ As § 2 of the Fourteenth Amendment does not alter the Fifteenth Amendment, it does not preclude Congress from prohibiting racially discriminatory felon disenfranchisement pursuant to the Fifteenth Amendment Enforcement Clause. *See Hayden,* 449 F.3d at 350 (Parker, J., dissenting); *Johnson,* 405 F.3d at 1240–41 (Wilson, J., dissenting); *id.* at 1248 (Barkett, J., dissenting); *see also Farrakhan,* 338 F.3d at 1016 (Section 2 of the Fourteenth Amendment does not preclude Congress from remedying racially discriminatory felon disenfranchisement pursuant to Fourteenth Amendment).

Therefore, this court does not find that § 2 of the Fourteenth Amendment would render the VRA unconstitutional if it covers felon disenfranchisement laws that were not enacted with discriminatory intent. This court also respectfully disagrees with the Eleventh Circuit and finds that § 2 of the Fourteenth Amendment does not " 'raise the serious constitutional problems' " which require the court to " 'construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.' "

*Johnson,* 405 F.3d at 1229 (*quoting De-Bartolo Corp. v. Florida Gulf Coast Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). Accordingly, the court must interpret the VRA in the conventional manner, by considering the language of the statute in the context in which it is used. *See Roberson,* 459 F.3d at 51.

The VRA states, in pertinent part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(a).

The current text of § 2 resulted from a 1982 amendment to the VRA.

The amendment was largely a Court's plurality opinion in 55 (1980), which had declared a violation either of § 2 response to [the Supreme] *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) that, in order to establish or of the Fourteenth or Fifteenth Amendments, minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose. Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by the Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts before *Bolden, supra.* S.Rep. No. 97–417, 97th Cong. 2nd Sess. 28 (1982), U.S.Code Cong. & Admin. News 1982, pp. 177, 205.

*Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Hayden,* 449 F.3d at 348 (Parker, J., dissenting). Therefore, § 2(a) expressly covers all voting qualifications without any stated (or suggested) exemption for felon disenfranchisement laws; provides that, at least in certain circumstances, a voting qualification with a discriminatory effect will violate the statute; and establishes a particular "results test" for determining if a violation has occurred.

The unqualified prohibition established by § 2(a) is intentionally broad. In § 2 Congress sought "to give the Act the broadest possible scope" in order to cover various practices that "might effectively be employed to deny citizens their right to vote." *Allen v. State Bd. Of Elections,* 393 U.S. 544, 566, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

■ Although it is broad, § 2 is not ambiguous. *See Farrakhan,* 338 F.3d at 1016 ("Section 2 is clear"); *Hayden,* 449 F.3d at 346 (Parker, J., dissenting); *id.* at

363 (Calabresi, J., dissenting); *id.* at 368 (Katzmann, J., dissenting); *Johnson,* 405 F.3d at 1240 (Wilson, J., dissenting); *id.* at 1247 (Barkett, J., dissenting). "A statute can be unambiguous without addressing every interpretive theory offered by a party. It need only be 'plain to anyone reading the Act' that the statute encompasses the conduct at issue." *Salinas v. United States,* 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)). As § 2 of the VRA states that "no voting qualification ... shall be imposed ... which results in a denial ... of the right to vote on account of race or color ..." and article CXX requires that a citizen not be an incarcerated felon to be eligible to vote, it is plain that article CXX is a voter qualification which could, in certain circumstances, violate the VRA if it is construed literally.

Nevertheless, it is appropriate to consider any relevant and reliable legislative history to determine whether a literal interpretation of the broadly worded statute, would "lead to results that Congress did not intend or that are even absurd." *Hayden,* 449 F.3d at 368 (Katzmann, J., dissenting).

In *Hayden,* the majority of the Second Circuit focused on statements made in connection with pre–1982 amendments to the VRA and concluded that "Congress never intended to extend the coverage of the Voting Rights Act to felon disenfranchisement." 449 F.3d at 322. The Eleventh Circuit essentially did the same. *See Johnson,* 405 F.3d at 1232–34. However, this court agrees with Judge Robert Katzmann, who wrote in his dissent in *Hayden:*

> Because [§ 2] does not speak specifically to the question we address today, if I saw clear evidence in the authoritative legislative history that the Congress that enacted it intended to exclude felon disenfranchisement policies from its reach, I would so construe it. But when we look to the authoritative legislative history of [§ 2's] enactment in 1982—the materials directly relevant to our present inquiry, under conventional methods of statutory analysis—or even to activity in the immediately preceding Congress, we find complete silence as to whether Congress intended to exclude felon disenfranchisement policies from its reach. Surely, the silence of enacting legislators cannot overcome the unambiguous and broadly worded provisions of a statute that was meant to apply to a multitude of state policies not specifically enumerated in its text—notwithstanding the majority's references to congressional activity in legislative sessions far removed from the Congress that enacted § 1973(a) in 1982, as well as to Congress's assumptions in enacting unrelated legislation.
>
> I see no precedent for not following the plain language under these circumstances. What we have here cannot be that rare situation where "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters," *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotations omitted), because we have literally no evidence as to the intention of the drafters of the 1982 provision specifically with respect to felon disenfranchisement policies. Moreover, because reasonable people can differ over the wisdom of extending the Act's coverage to felon disenfranchisement policies, such a result cannot be considered "absurd" or "unthinkable." *See Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring). If Congress has a different view, then it is free to amend [§ 2]

accordingly. But this court has no license on its own to do so.

449 F.3d at 369.

■ The conclusion that the VRA covers felon disenfranchisement laws is not, as defendant contends, qualified by the "clear statement rule" (or "plain statement rule"), which requires Congress to make its intent "unmistakably clear" when enacting statutes that would alter the usual constitutional balance between the federal government and the states. *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The clear statement rule applies when Congress " 'intends to pre-empt the historic power of the States' or when it legislates in 'traditionally sensitive areas' that 'affect the federal balance.' " *Raygor v. Regents of Univ. of Minn.,* 534 U.S. 533, 543, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002) (*quoting Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

■ The clear statement rule does not apply in the instant case for two reasons. First, the rule does not apply when the contested statute is not ambiguous. *See, e.g., Salinas,* 522 U.S. at 60, 118 S.Ct. 469. As described earlier, § 2 is not ambiguous.

■ In addition, the clear statement rule does not apply because the VRA did not alter the usual balance of power between the states and the federal government. Rather, as Judge Parker wrote in his dissent in *Hayden,* "the seismic shift created by the Fourteenth and Fifteenth Amendments clearly altered the federal-state balance in an attempt to address a truly compelling national interest—namely, reducing racial discrimination perpetuated by the states. Indeed, these Amendments 'were specifically designed as an expansion of federal power and an intrusion on state sovereignty.' " 449 F.3d at 358 (*quoting Gregory,* 501 U.S. at 468, 111 S.Ct. 2395). The Fifteenth Amendment, ratified in 1870, was particularly aimed at removing from the states some of their then traditional discretion to regulate the right to vote. The 1982 amendment to the VRA, therefore, did not alter what had for more than a century been the balance of power between the states and the federal government in defining the qualifications for voting. Accordingly, the clear statement rule does not apply to the VRA.[6]

Finally, the defendant contends that if the VRA governs felon disenfranchisement laws that were not enacted with discriminatory intent it is unconstitutional under the test described in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In *Boerne,* the Supreme Court explained that Congress' power to enforce the substantive guarantees of the Fourteenth Amendment can be exercised only with "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520, 117 S.Ct. 2157. As the texts of the Fourteenth and Fifteenth Amendment Enforcement Clauses are identical, the court understands that this requirement is equally applicable to the Fifteenth Amendment.

In dissenting from a decision of the Ninth Circuit not to rehear *Farrakhan en*

---

6. This conclusion was shared by the majority of the Second Circuit. *See Hayden,* 449 F.3d at 337 (Straub, J., concurring) (joined by Sack, J.) ("We do not join in any holding that a clear statement rule applies here, as we believe such a rule ... would be inappropriate in the voting rights context"); *Id.* at 356-

59 (Parker, J. dissenting) (joined by Calabresi, J., Pooler, J., Sotomayor, J.) ("For several reasons, the clear statement rule does not apply."); *see also id.* at 369 (Katzmann, J., concurring) ("I see no precedent for not following the plain language under these circumstances").

*banc*, Judge Alex Kozinski expressed and explained the view that if the VRA extends to felon disenfranchisement laws that were not enacted with an intent to discriminate based on race, it may be unconstitutional under *Boerne*. *See Farrakhan v. Washington*, 359 F.3d 1116, 1122–25 (9th Cir. 2004). In his dissent, Judge Kozinski stated that Congress must identify the evil targeted by its legislation more specifically than racial discrimination generally, and target only those specific practices that Congress has documented with historical examples. *Id.* at 1121; *see also Johnson*, 405 F.3d at 1231–32; *Hayden*, 449 F.3d at 330–336 (Walker, J., concurring).

However, in *Boerne*, the Supreme Court wrote that "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *Boerne*, 521 U.S. at 536, 117 S.Ct. 2157 (*quoting Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)). It explained that:

> [j]udicial deference, in most cases, is based not on the state of the legislative record Congress compiles but on due regard for the decision of the body constitutionally appointed to decide. As a general matter, it is for Congress to determine the method by which it will reach a decision.

*Id.* at 531–32, 117 S.Ct. 2157 (internal quotation marks and citation omitted).

Similar deference is owed to Congress' efforts to enforce the guarantees of racial equality under the Fifteenth Amendment. In addressing the constitutionality of the VRA, the Supreme Court has explained that in enacting it Congress recognized that in certain parts of our country the states had perpetuated "through unremitting and ingenious defiance of the Constitution" the "insidious and pervasive evil" of race-based disenfranchisement. *Katzenbach*, 383 U.S. at 309, 86 S.Ct. 803. Targeted, case-by-case efforts failed to end persistent and evolving unconstitutional practices. *Id.* at 310–11, 86 S.Ct. 803. Legislation prior to the VRA, it was found, "did little to cure the problem of voting discrimination." *Id.* at 313, 86 S.Ct. 803. Therefore, § 2 of the VRA as originally written, "broadly prohibit[ed] the use of voting rules to abridge exercise of the franchise" in every state. *Id.* at 316, 86 S.Ct. 803. In assessing the constitutionality of this broad prohibition, it is important to recognize that Congress need not limit itself to remedying past discrimination but may also enact prophylactic legislation under the Enforcement Clauses of the Fourteenth and Fifteenth Amendments "proscribing practices that are discriminatory in effect, if not intent." *Tennessee v. Lane*, 541 U.S. 509, 520, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).

As a result of the long and persistent pattern of racial discrimination that has been recognized by Congress and the Supreme Court, statutes addressing racial discrimination have been viewed differently than other laws for the purposes of *Boerne* analysis. As Judge Parker explained in his dissent in *Hayden*:

> Since its 1997 decision in *Boerne*, the Supreme Court has issued several decisions concerning the scope of Congress's authority to enact prophylactic legislation under § 5 of the Fourteenth Amendment. The Supreme Court has held, for example, that Congress lacked the power under § 5 to abrogate state sovereign immunity to suit for discrimination on the basis of disability, age, and religion. *See [Bd. of Tr. of the Univ. of Ala. v.] Garrett*, 531 U.S. [356, 374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) ] (disability); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91, 120 S.Ct. 631, 145

L.Ed.2d 522 (2000) (age); *Boerne,* 521 U.S. at 536, 117 S.Ct. 2157 (religion). The Supreme Court's decisions turned on a lack of "congruence and proportionality," *id.* at 530, 117 S.Ct. 2157; in other words there was insufficient evidence of discrimination to justify federal intrusion into matters traditionally regulated by the states.

By contrast, despite any number of opportunities, the Supreme Court has never questioned the constitutionality of the VRA. Indeed, the Supreme Court has referred to it as the paradigm of appropriate remedial legislation. *See [Nev. Dep't of Human Res. v.] Hibbs,* 538 U.S. [721, 738, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) ] (upholding the FMLA and likening it to the VRA, which the Court described as a "valid exercise[ ] of Congress' § 5 power"); *Garrett,* 531 U.S. at 373, 121 S.Ct. 955 ("The ADA's constitutional shortcomings are apparent when the Act is compared to Congress' efforts in the Voting Rights Act of 1965 to respond to a serious pattern of constitutional violations."); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 640, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (distinguishing the Patent Remedy Act from the VRA on account of the "undisputed record of racial discrimination confronting Congress in the voting rights cases"); *Boerne,* 521 U.S. at 518, 117 S.Ct. 2157 ("[M]easures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures place[ ] on the States.").

*See Hayden,* 449 F.3d at 360–61.

Accordingly, this court does not find that *Boerne* renders the VRA unconstitutional if the VRA extends to felon disenfranchisement laws that were not enacted with discriminatory intent. Nor does

*Boerne* create the kind of serious doubt concerning the constitutionality of the VRA that would require the court to construe it more narrowly than its terms suggest. *See DeBartolo,* 485 U.S. at 575, 108 S.Ct. 1392.

■■■ Because this court finds that § 2 of the VRA is intended to cover felon disenfranchisement laws and is not unconstitutional as applied to them, it is necessary to decide the defendant's request for judgment on the pleadings. This claim, too, is not meritorious.

■■■ A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is subject to the same standard of review as that employed for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Collier v. City of Chicopee,* 158 F.3d 601, 602 (1st Cir.1998). Accordingly, in deciding a motion for judgment on the pleadings, the court must "accept all of the non-movant's well-pleaded factual averments as true." *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988). In order to survive such a motion, the plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988).

Claims in a complaint need not only be possible but also plausible. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). The plaintiff may not rest merely on "unsupported conclusions or interpretations of law." *Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 971 (1st Cir.1993).

■■■ However, there is no heightened pleading requirement in this case alleging a violation of civil rights. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512–13,

122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66 (1st Cir.2004). The ruling in "*Swierkiewicz* is fully applicable to all civil rights actions." *Educadores*, 367 F.3d at 66, n. 1. As the First Circuit has explained:

> *Swierkiewicz* has sounded the death knell for the imposition of a heightened pleading standard except in cases in which either a federal statute or specific Civil Rule requires that result. In all other cases, courts faced with the task of adjudicating motions to dismiss under Rule 12(b)(6) [and Rule 12(c)] must apply the notice pleading requirements of Rule 8(a)(2). Under that rule, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). State of mind, including motive and intent, may be averred generally. *Cf.* Fed.R.Civ.P. 9(b) (reiterating the usual rule that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally"). In civil rights actions, as in the mine-run of other cases for which no statute or Federal Rule of Civil Procedure provides for different treatment, a court confronted with a Rule 12(b)(6) motion "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

*Educadores*, 367 F.3d at 66 (footnote omitted).

With regard to the VRA, the First Circuit has noted that in view of the totality of the circumstances test required to be applied by § 2(b), "[i]t is no accident that most cases under section § 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (*en banc*).[7] The First Circuit has advised courts to be cautious in granting a motion to dismiss a § 2 claim which represents a major variant of the paradigm addressed in *Gingles*—the single member electoral district. *Id.* This caution is relevant to the instant case.

 As explained earlier, § 2 of the VRA was substantially revised in 1982 to make clear that a plaintiff is not required to prove that "a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose." *Gingles*, 478 U.S. at 35, 106 S.Ct. 2752. Rather, a "results test" based on consideration of "the totality of the circumstances" provides the relevant legal standard. *Id.* The Supreme Court, interpreting § 2, has elaborated on the totality of the circumstances test, stating that a practice violates the VRA if it "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. 2752. "Congress intended a broad range of factors to be taken into account" in deciding whether a violation of the VRA has been proven. *Metts*, 363 F.3d at 10. For present purposes, the court assumes that "'a bare statistical showing of disproportionate impact on a

---

**7.** Two of the three VRA felon disenfranchisement cases have been decided on motions for summary judgment. *See Farrakhan*, 338 F.3d at 1010, (summary judgment); *Johnson*, 405 F.3d at 1217 (summary judgment); *but see Hayden*, 449 F.3d at 309 (motion for judgment on the pleadings).

racial minority does not satisfy the [section] 2 'results inquiry' because causation cannot be inferred from impact alone.'" *Farrakhan,* 338 F.3d at 1018 (*quoting Smith v. Salt River Agr. Impr. & Power Dist.,* 109 F.3d 586, 595 (9th Cir.1997)). However, in the context of a felon disenfranchisement law, racial bias in the criminal justice system is a relevant factor in the totality of the circumstances analysis prescribed by § 2. *Id.* at 1020.

In this case, the plaintiffs have alleged: (1) that article CXX has "a disproportionately adverse effect on the voting rights of African–American and Hispanic–Americans," Second Am. Comp. ¶¶ 51, 52; (2) that such disproportionate effect "is caused by, among other things, the facts that African–American and Hispanic–Americans are over-represented in the population of Massachusetts incarcerated felons," *id.;* (3) "that there exists considerable racial and ethnic bias, both direct and subtle, in the Massachusetts court system," *id.;* (4) there is a causal link between the overrepresentation of minorities in the incarcerated felon population and the racial and ethnic bias in the Massachusetts court system, *id.;* and (5) that lawmakers were aware of the possibility of bias in the Massachusetts court system prior to the passage of article CXX because of, among other things, the publication of the 1994 Final Report of the Massachusetts Commission to Study Racial and Ethnic Bias in the Courts, *id.* at ¶¶ 21–22.

The court finds that these allegations provide the required short, plain statement of plaintiffs' VRA claim. They address each element of that claim and give the defendants fair notice of it. It may be difficult for plaintiffs to prove that racial bias in the court system exists and has interacted with other cognizable factors to render the disenfranchisement of incarcerated felons in Massachusetts unlawful under the VRA. However, at this point, the court does not conclude that the plaintiffs' claim is implausible or necessarily unsupportable. Therefore, as in *Metts,* "the plaintiffs are entitled to an opportunity to develop evidence before the merits are resolved." 363 F.3d at 11.

## IV. ORDER

For the reasons stated in this Memorandum, it is hereby ORDERED that:

1. The Plaintiff's Motion for Summary Judgment (Docket No. 88) is DENIED.

2. The Defendant's Motion For Summary Judgment on Count I and II (Docket No. 81) is ALLOWED.

3. The Defendant's Motion Judgment on The Pleadings on Count III (Docket No. 88) is DENIED.

4. The Defendant's Motion For Reconsideration (Docket No. 101) is DENIED.[8]

5. A Scheduling Conference will be held on October 4, 2007, at 3:00 p.m. The parties shall comply with the attached Scheduling Order.

---

8. The court allowed the plaintiffs' motion to file the Second Amended Complaint without prejudice to possible reconsideration of whether it complied with the pleading requirements of Federal Rule of Civil Procedure 8(a), or whether the amendment was futile because § 2 of the VRA does not reach felon disenfranchisement laws. *See* April 20, 2007 Order. The respondent filed a motion for reconsideration on those grounds, which plaintiffs opposed. As these issues are identical to those raised in the motion for judgment on the pleadings with regard to the Second Amended Complaint, they were not addressed separately.