Gillian **MILLER, Lakisha Austin, Arthur Davis, and Luella Davis, Plaintiffs,**

v.

**COUNTRYWIDE BANK, N.A., Countrywide Home Loans, Inc., Countrywide Correspondent Lending, Full Spectrum Lending, Inc., Summit Mortgage LLC, and Loans for Residential Homes Mortgage Corp., Defendants.**

**Civil Action No. 07cv11275–NG.**

United States District Court, D. Massachusetts.

July 30, 2008.

---

Gary E. Klein, Shennan Alexandra Kavanagh, Roddy Klein & Ryan, Boston, MA, Matthew E. Van Tine, Miller Law LLC, Chicago, IL, for Plaintiffs.

James W. McGarry, Michelle R. Gonnam, Thomas M. Hefferon, Goodwin Procter, LLP, William A. Worth, Prince, Lobel, Glovsky & Tye LLP, Boston, MA, for Defendants.

### *MEMORANDUM AND ORDER RE: MOTION TO DISMISS*

GERTNER, District Judge.

## I. *INTRODUCTION*

Plaintiffs Gillian Miller, Lakisha Austin, and Arthur and Luella Davis (collectively "plaintiffs"), on behalf of themselves and all other similarly situated African–American borrowers, bring this putative nationwide class action against Countrywide Bank, a division of Treasury Bank, N.A., Countrywide Home Loans, Inc., and its wholly-owned subsidiaries, Countrywide Correspondent Lending ("Countrywide Correspondent"), and Full Spectrum Lending, Inc. ("Full Spectrum") (collectively "Countrywide" or "defendants"). Plaintiffs also assert claims against two retail mortgage lenders, Summit Mortgage, LLC ("Summit"), and Loans for Residential Homes Mortgage Corp. ("LFRHM").

Plaintiffs allege that Countrywide's Discretionary Pricing Policy ("pricing policy") has a widespread discriminatory impact on African–American applicants for home mortgage loans, in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691(f), and Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619.[1] That system, plaintiffs allege, makes African–Americans who borrow from Countrywide over three times more likely than white borrowers to receive a high-APR[2] home loans and two times more likely to receive a high-APR refinancing loan.[3] This disparity, plaintiffs contend, is not fully explained by any objective indicia of creditworthiness, such as credit history, credit score, debt-to-income ratio, or loan-to-value ratio. Instead, they argue that a significant portion of the disparity is explained by Countrywide's pricing policy, which explicitly allows for subjective price markups at the point of sale—markups above the fees set according to Countrywide's objective, risk-based criteria. These subjective markups, in turn, have a disparate impact on African–American home buyers.

The case is currently before the Court on Defendants' Motion to Dismiss (document #16) under Fed.R.Civ.P. Rule 12(b)(6). For the reasons that follow, defendants' motion is **DENIED**.

---

1. Plaintiff Miller asserts individual claims against Summit under the ECOA and FHA; there are no class claims against Summit. Plaintiffs Arthur and Luella Davis bring individual claims against LFRHM under both the ECOA and FHA.

2. A high-APR loan is a loan whose APR is at least three percentage points higher than the interest rate on United States Treasury Securities of the same maturity at the time the loan was made.

3. Plaintiffs cite recent Home Mortgage Disclosure Act ("HMDA") data from HUD.

If the facts alleged in the complaint are to be believed—which they must at this point in the litigation—the net effect of Countrywide's pricing policy is a classic case of disparate impact: White homeowners with identical or similar credit scores pay different rates and charges than African–American homeowners, because of a policy that allows racial bias to play a part in the pricing scheme.

## II. FACTS

Plaintiffs are all African–American homeowners residing in the greater Boston area who obtained home mortgages through Countrywide, its subsidiaries, or the two named retail mortgage lenders between January 1, 2001, and the date of this action ("Class Period").[4]

Countrywide is one of the largest mortgage lenders in the United States. It makes home loans directly through its various subsidiaries, such as Full Spectrum, as well as through a network of independent mortgage brokers. Countrywide also obtains business through a network of correspondent lenders, such as Summit and LFRHM, that originate loans and then sell them to Countrywide.

According to the complaint, Countrywide's pricing policy works like this: Countrywide obtains customers' credit information through its loan officers, brokers, or correspondent lenders. Based on these objective criteria, Countrywide computes a "par rate." Agents, brokers, or correspondent lenders at the point of sale, however, are allowed to impose additional charges, fees, and rates that are unrelated to objective risk factors. Countrywide communicates not only the applicable par rates, but also the additional authorized discretionary charges to its loan officers, brokers, and correspondent lenders through regularly published "rate sheets."[5]

As a result of these additional discretionary charges, the complaint alleges, African–American borrowers pay disproportionately high interest and fees on their home loans. Additionally, African–American borrowers are more likely than white borrowers to apply for credit from Countrywide through its sub-prime subsidiary, Full Spectrum, or from an authorized broker or correspondent lender, which are on average more expensive than loans obtained directly from Countrywide. To be sure, plaintiffs concede that creditworthiness may explain part—but only part—of the disparity in credit rates. However, the resulting discrepancies between the rates paid by African–American and white borrowers cannot, according to plaintiffs, be explained entirely by any objective criterion.

The individual plaintiffs' allegations track the disparate impact allegations. On January 31, 2006, Plaintiff Miller financed her home in Hyde Park with two loans obtained through Summit. According to the complaint, Countrywide "table-funded" the loans, meaning that the loans were underwritten by Countrywide. The loans were then sold to Countrywide. Plaintiff Austin purchased her home in September

---

4. Gillian Miller obtained her loan in 2006 through Summit, which, in turn, sold the loan to Countrywide. Lakisha Austin obtained her loan through Full Spectrum in 2004. Arthur and Luella Davis refinanced their home through LFRHM in 2005.

5. Plaintiffs also allege that for all of the transactions at issue here, Countrywide advances the funds to make the loans and bears some or all of the risk of default. Countrywide also provides its loan officers, brokers, and correspondent lenders with credit applications, loan contracts, and other required financing forms, as well as instructions on filling out such documents.

2004 with financing from Full Spectrum. And plaintiffs Arthur and Luella Davis refinanced their home in August 2005 through LFRHM. All of the named plaintiffs allege that they ended up paying more for their loan in fees and increased interest rates than they would have but for Countrywide's discriminatory pricing policy and the application of subjective pricing criteria.[6]

## III. DISCUSSION

Countrywide has moved to dismiss plaintiffs' complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Countrywide also moves to dismiss Plaintiffs Miller and Davis' claims, arguing that they assert disparate treatment claims against third parties (Summit and LFRHM) rather than disparate impact claims against Countrywide or its subsidiaries.

The crux of Countrywide's argument is that plaintiffs have not alleged a sufficiently specific discriminatory policy to support a disparate impact claim under the ECOA or FHA. Defendants draw on *Smith v. City of Jackson*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), in which the Supreme Court rejected a disparate impact claim under the Age Discrimination in Employment Act ("ADEA") because the targeted policy lacked sufficient specificity. Underlying defendants' argument is another recent Supreme Court decision, *Bell Atlantic Corp. v. Twombly*, ─── U.S. ───, 127 S.Ct. 1955, 167 L.Ed.2d 929, (2007),

which rejected the lax pleading standard of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and held that a complaint must be dismissed if it fails to allege a set of facts sufficient to create a "plausible" entitlement to relief.[7] *Twombly*, 127 S.Ct. at 1966.

### A. Plaintiffs' Prima Facie Disparate Impact Claim

In order to properly assert a disparate impact claim, plaintiffs must plead 1) a specific and actionable policy, 2) a disparate impact, and 3) facts raising a sufficient inference of causation. *See City of Jackson*, 544 U.S. at 241, 125 S.Ct. 1536.

#### 1. Specific and Actionable Policy

The "specific and actionable policy" that plaintiffs challenge is Countrywide's discretionary pricing policy, which allows Countrywide's retail salesmen, independent brokers, and correspondent lenders to add various charges and fees based on subjective non-risk factors, and which, in turn, has a racially discriminatory impact on African–American borrowers. Plaintiffs' claim is in the mold of the Supreme Court's decision in *Watson v. Fort Worth Bank*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), which held that an employer's deference to the subjective decisionmaking of frontline employees may serve as the basis for a disparate impact claim.[8] *Id.* at 990–91, 108 S.Ct. 2777. There, the Court wrote:

**6.** Plaintiffs Miller and Austin, in particular, alleges that she received a sub-prime loan even though she qualified for a prime-market rate.

**7.** Plaintiffs note, however, that while their allegations must be plausible, there is no heightened pleading requirement. *See Erickson v. Pardus*, ─── U.S. ───, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (*Twombly* is not inconsistent with Fed.

R.Civ.P. 8(a)(2)); *Simmons v. Galvin*, 2007 WL 2507740, at *17 (D.Mass. Aug.30, 2007).

**8.** *Watson* expanded the disparate impact theory of *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The issue in *Griggs* was whether Title VII prohibited an employer from requiring a high school education or passing of a standardized general intelligence test as a condition of employment when 1) neither standard was

If an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. In both circumstances, the employer's practices may be said to 'adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin.'

*Id.* at 990–91, 108 S.Ct. 2777 (quoting 42 U.S.C. § 2000e–2(a)(2)). *Watson's* focus on subjective decisionmaking has particular resonance in the instant context, where the fundamental question under the ECOA and the FHA is creditworthiness, rather than, say, vague notions of suitability for this or that employment under Title VII. While Countrywide plainly identifies the objective standards that define creditworthiness in the par rate, it enables its agents, brokers, and correspondent lenders to add other charges at their own discretion, untethered from an objective assessment of creditworthiness.

The question before the Court, however, is whether plaintiffs have alleged Countrywide's policy with sufficient specificity. Defendants cite *City of Jackson,* in which the Supreme Court reiterated the requirement that disparate impact plaintiffs allege the targeted practice with enough specifici-

ty to give defendants fair notice as to the actions they must defend:

[I]t is not enough simply to allege that there is a disparate impact ... or point to a generalized policy that leads to such an impact. Rather, the [plaintiff] is " 'responsible for isolating the specific ... practices that are allegedly responsible for any observed statistical disparities.' "

544 U.S. at 241, 125 S.Ct. 1536 (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (quoting *Watson,* 487 U.S. at 994, 108 S.Ct. 2777)).

The criticism the Court leveled at plaintiff's case in *City of Jackson* does not apply to the case at bar. *City of Jackson* involved a challenge under the ADEA to a pay increase plan that resulted in proportionately greater raises going to police officers under the age of 40. *Id.* at 230, 125 S.Ct. 1536. The Supreme Court held that plaintiffs had "done little more than point out that the pay plan at issue is relatively less generous to older workers," and had "not identified any specific test, requirement or practice within the pay plan that has an adverse impact on older workers." *Id.* at 241, 125 S.Ct. 1536. However, more specificity was required, in part, by the particular terms of the ADEA, which expressly exempt liability for acts "based on reasonable factors other than age." [9]

shown to be significantly related to successful job performance, 2) both requirements operated to disqualify African–American applicants at a substantially higher rate than white applicants, and 3) the jobs in question formerly had been filled only by white employees as part of a longstanding practice of giving preference to whites. 401 U.S. at 425–429, 91 S.Ct. 849. There, the Supreme Court reasoned that Title VII was directed "to the consequences of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. 849. The objective of Title VII was broadly conceived, "to achieve equality of employment opportunities and remove barriers that

have operated in the past to favor an identifiable group of white employees over other employees." *Id.* at 429–30, 91 S.Ct. 849.

In *Watson,* the Court extended the rationale in *Griggs* to situations in which employment decisions are based not on precise or formal criteria—such as educational attainment or test results—but on the subjective assessments of supervisors familiar with the candidates and with the job to be filled. 487 U.S. at 999, 108 S.Ct. 2777.

9. The ADEA by its terms requires greater specificity than the statutes at issue here. In

Thus, the Court held, plaintiffs could not maintain a disparate impact claim under the ADEA.[10] *Id.*

The allegations here are different. Plaintiffs have identified the practice at issue: establishing a par rate keyed to objective indicators of creditworthiness while simultaneously authorizing additional charges keyed to factors unrelated to those criteria. Plaintiffs allege that the net effect of that discretionary pricing policy yields a discriminatory result.[11]

Defendants, however, assert that this "pricing policy" is really no policy at all: Countrywide simply permits loan officers to negotiate loan interest rates, charges, and points that are higher than the par rate (which is based on objective risk factors). Countrywide argues that the complaint boils down to a claim that Countrywide should not be able to have a policy of selling its product for what people will pay for it after negotiating in the shadow of market forces.[12]

---

pertinent part, the ADEA provides that "it shall not be unlawful for an employer ... to take any action otherwise prohibited under ... this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or *where the differentiation is based on reasonable factors other than age.*" 29 U.S.C. § 623(f)(1) (emphasis added).

**10.** Plaintiffs note that in *City of Jackson* the Court affirmed lower court's granting of *summary judgment* for the city, not a motion to dismiss.

**11.** The complaint alleges that "[s]tatistical analysis of discretionary charges imposed on black and white customers of other mortgage companies that use credit pricing systems structured like that of Countrywide ... revealed that blacks, after controlling for credit risk, are substantially more likely than similarly situated whites to pay such charges." Compl. ¶ 48 (document # 1).

**12.** Defendants cite a 1985 Ninth Circuit opinion written by now-Justice Kennedy for the proposition that policies that turn on competitive market forces do not "yield to disparate impact analysis." *AFSCME v. Washington,* 770 F.2d 1401, 1406 (9th Cir.1985). Their argument is substantially overstated. *AFSCME* involved a broad based and innovative challenge to the wages set by the state of Washington. *Id.* at 1403. Plaintiffs sought to apply disparate impact theory to a novel comparable worth claim, challenging the disparities of pay between men and women employed in different jobs of comparable worth. *Id.* They argued that a wage system in which wages reflected prevailing market rates rather than the comparable worth of individual jobs,

female-predominated jobs were paid less than male-predominated jobs. *Id.*

The Ninth Circuit rejected the claim, saying: "A compensation system that is responsive to supply and demand and other market forces is not the type of specific, clearly delineated employment policy contemplated by *Dothard* and *Griggs*; such a compensation system, the result of a complex of market forces, does not constitute a single practice that suffices to support a claim under disparate theory." *Id.* at 1406.

Drawing on this reasoning, defendants in the instant case argue that allowing a disparate impact claim here would prevent the pricing of loans from being responsive to supply and demand. However, the Ninth Circuit's decision in *AFSCME* was less about whether courts must defer to market forces in the face of disparate impact claims than it was about the specificity of the underlying claim. The Court rejected the claim as simply too diffuse, since an analysis of "comparable worth" would require an assessment "too multifaceted to be appropriate for disparate impact analysis." *Id.* at 1406. According to the Court, disparate impact analysis is "confined to cases which challenge a specific clearly delineated employment practice applied at a single point in the job selection process." *Id.* at 1405. The claim in *AFSME* made no such distinctions and arguably invited the courts in to second guess wages across all levels, involving all jobs.

To say that "market forces" justify discriminatory treatment of African–Americans (or women, or ethnic minorities) as a broad proposition would be to overturn the discrimination statutes of the past thirty years.

The "market forces" argument is troubling. It is precisely because the market could not self-correct for discrimination that statutes like Title VII, the FHA, and ECOA were necessary. *See, e.g., Corning Glass Works v. Brennan,* 417 U.S. 188, 195 n. 3, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The market, after all, traditionally valued "individual preferences," even when those preferences derived from racial and gender-based stereotypes. *See, e.g., Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385 (5th Cir.1971), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). Indeed, the "market" led employers to impose job requirements that bore no relationship to job performance. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

In any case, the "market forces" argument has been rejected in cases that present issues directly analogous to those at bar. *See Jones v. Ford Motor Credit Co.,* 2002 WL 88431 (S.D.N.Y. Jan.22, 2002) (plaintiff properly pleaded disparate impact claim where financing for car was based on subjective criteria beyond creditworthiness); *Smith v. Chrysler Fin. Co.,* 2003 WL 328719 (D.N.J. Jan.15, 2003) (same). In *Jones,* for example, the Court denied Ford's motion to dismiss where plaintiffs had alleged that Ford's policy of authorizing car dealers to subjectively mark up otherwise objective, risk-based finance charge rates had a disparate impact on African–American consumers and violated the ECOA.2002 WL 88431, at *4 (citing, inter alia, 12 C.F.R. § 202.6 n. 2).[13] Both *Jones* and *Smith* provide strong support for Plaintiffs' position.

Where the allocation of subjective decisionmaking authority is at issue, the "practice" amounts to the *absence* of a policy, that allows racial bias to seep into the process. Allowing this "practice" to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to "insulate" themselves by "refrain[ing] from making standardized criteria absolutely determinative." *Watson,* 487 U.S. at 990, 108 S.Ct. 2777. This is especially the case in this context. Unlike in the employment context, subjective criteria, unrelated to creditworthiness, should play *no* part in determining a potential borrower's eligibility for credit.

Accordingly, I find that plaintiffs have identified a sufficiently specific policy.[14]

## 2. *Disparate Impact*

Next, defendants argue that plaintiffs have failed to properly plead disparate impact. According to defendants, the complaint does not allege with the required specificity a racial imbalance.

Plaintiffs have alleged that African–American borrowers are three time more likely to obtain a high-APR home mortgage and two time more likely to obtain a high-APR home refinancing loan than white borrowers. They further allege that these differences cannot be wholly explained by objective credit risk criteria. Defendants claim that because Plaintiffs do not expressly allege that African–Americans receive higher rates than *similarly situated* whites, the claim must fail.[15]

---

**13.** 12 C.F.R. § 202.6 n. 2 indicates that Congress intended an "effects test" concept.

**14.** This conclusion is in keeping with the decision in the parallel case of *Garcia v. Countrywide,* 07–1161–VAP (C.D.Cal. Jan. 17, 2008).

**15.** Defendants cite a recent report by a group of Federal Reserve economists that "strongly indicates" that HMDA data, standing alone, does not show disparate discriminatory impacts. Plaintiffs cite reports to the contrary. This is an argument better suited for summary judgment or trial.

I disagree. The conclusion is fairly comprised in this complaint. The alleged facts give rise to a fair inference that African–American borrowers are charged higher fees and rates than similarly situated white borrowers. This is especially so in light of the individual named plaintiffs' allegations, which expressly state that they were steered into less advantageous sub-prime loan terms despite being eligible for prime-market loans.

In effect, defendants' challenge goes to questions of proof rather than the adequacy of the pleading. Plaintiffs may well be unable to prove that race—rather than objective criteria of creditworthiness that may correlate with race—accounts for any disparate impact in Countrywide's pricing of its loans. However, that is a question for a later stage in this proceeding.

### 3. *Causal Connection*

Defendants next argue that plaintiffs have not adequately pled a causal connection between the identified policy and the alleged disparate impact.

Defendants rely heavily on the Supreme Court's decision in *Wards Cove*, a Title VII case in which plaintiffs alleged that a number of employment practices—such as nepotism, separate hiring channels, and rehire preferences—had a disparate impact on minority employees.[16] 490 U.S. at 657, 109 S.Ct. 2115. The plaintiffs in *Wards Cove* based their claim on statistics showing a disproportionately low percentage of minorities in the job positions at issue. *Id.* The Court held that plaintiffs had not made out a prima facie case, writing:

> Respondents will … have to demonstrate that the disparity they complain of is the result of one or more of the

employment practices that they are attacking here, specifically showing that each challenged practice has significantly disparate impact on employment opportunities for whites and nonwhites.

*Id.*; *see also Collette v. St. Luke's Roosevelt Hosp.*, 132 F.Supp.2d 256, 276 (S.D.N.Y.2001).

Defendants argue that plaintiffs have only alleged "bottom line" disparities without providing a theory of how the targeted policy caused the disparity. Countrywide underscores the fact that plaintiffs concede that objective credit risk criteria that tend to correlate with race may explain some of the discrepancy. This concession, Countrywide argues, undermines any allegation of causation and requires dismissal of the class claim. Moreover, Countrywide argues that plaintiffs have ignore the role that plaintiffs themselves played in setting the rates of their loans since the discrepancies are allegedly the result of *mutually negotiated* agreements.

In the complaint, plaintiffs cite reports observing that granting markup discretion to brokers and/or employees in other mortgage companies often leads to discriminatory results. Plaintiffs also note that the plaintiffs in *Jones* cited similar data in their complaint, which subsequently survived a motion to dismiss.

Ultimately, the question of causation—to what extent the discrepancy is explainable by objective data or race—is premature. It seems clear that Plaintiffs' complaint gives rise to a fair inference of causation; the question of proof will become an issue at later stages in the proceedings.

---

**16.** Congress modified the holding in *Wards Cove* in the Title VII context through the Civil Rights Act of 1991. However, *Wards Cove* continues to apply in non-Title VII disparate impact cases. *See City of Jackson*, 544 U.S. at 240, 125 S.Ct. 1536 (characterizing the Court's construing of disparate impact claims as "narrow").

## B. *The Miller and Davis Claims*

■ Plaintiffs Miller and Arthur and Luella Davis have filed individual disparate treatment cases against Summit and LFRHM ("Individual Claims").[17] Countrywide argues that these disparate treatment claims against independently operated third parties may not serve as the basis for class action disparate impact claims against Countrywide.

Defendants assert that they have found no legal authority suggesting that a company may be found liable under a disparate impact theory for the discriminatory conduct of a third party. Specifically, they point to *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263 (11th Cir.2000), in which the Court rejected plaintiffs' disparate impact theory, reasoning that allowing plaintiffs to proceed on a disparate impact theory where the underlying allegations were merely the aggregation of many disparate treatment claims (involving intent) would risk "the potential conflation of disparate treatment and disparate impact claims." *Id.* at 1278.

First, it should be noted that the disparate impact claim in *Joe's Stone Crab* did not fail because of the Court's concern that it involved the acts of third parties. Moreover, the Court's concern about conflating disparate treatment and disparate impact claims; is misplaced. *Watson* explicitly allows for a challenge to the use of subjective criteria under an adverse impact theory.[18] *See, e.g., Allen v. Seidman,* 881 F.2d 375, 380–81 (7th Cir.1989) (Title VII case holding that disparate impact theory appropriate where bank examiner test, which involved an unstructured personal interview, had adverse effect on African–Americans).

In any case, the concerns of *Joe's Stone Crab* do not apply here. Countrywide's liability, if any, flows directly from *its own* participation in the transactions as the "creditor" which set the markup policy at issue. The ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal or continuation of credit; or *any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.*" 15 U.S.C. § 1691a(e) (emphasis added); *see also* 12 C.F.R. § 202.2(1).[19] Thus, plaintiffs argue, Congress clearly intended to extend liability to mortgage lenders in this situation.

Further, plaintiffs assert that Countrywide is directly embroiled in the decisions of these lenders. It authorizes mortgage brokers and correspondent lenders to accept applications on its behalf; quote financing rates and terms; inform applicants of Countrywide's financing options; and to originate finance transactions using its forms and in accordance with its pricing policy. Moreover, according to the complaint, correspondent lenders make loans based on Countrywide's credit-granting policies and funds these loans before or shortly after they are consummated with Countrywide's funds. In all of the home mortgage finance transactions at issue in

---

**17.** In both cases, the loans were originated through Summit and LFRHM, respectively, and then sold to Countrywide.

**18.** Indeed, this approach is not unlike the approach taken in jury selection cases, when the challenged practice involved the "key man" system. *See Castaneda v. Partida,* 430 U.S. 482, 484, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Jury service should involve objective criteria—citizenship, age, etc. Instead, certain jurisdictions left the selection of jurors to prominent citizens, the key men, who exercised their discretion in a way that excluded racial and ethnic minorities from jury service. *Id.*

**19.** The FHA definition is the same.

this case, Countrywide is alleged to have advanced the funds to make the loans and borne some or all of the risk of default. It also provided brokers and correspondent lenders with credit applications, loan contracts, and other forms, as well as instructions.

As such, the "third-party" problem is no problem at all.

## C. *Statute of Limitations*

Finally, Countrywide argues that plaintiff Austin's ECOA and FHA claims are time-barred by the statutes' respective two-year statutes of limitations. 15 U.S.C. § 1691e(f); 42 U.S.C. § 3613(a)(1)(A). According to Countrywide, the statutes of limitations began to run on the date Austin signed her closing documents—September 22, 2004. The initial complaint in this case was filed on July 12, 2007, nearly three years later. Thus, Countrywide argues, Austin's claims are barred.

Plaintiffs, for their part, argue that since the claim is directed at a policy that has a discriminatory effect on the her, and since that policy continues, the statute of limitations has not run. Alternatively, plaintiff contends that this Court should apply a discovery rule to these facts, holding that the statute of limitations began to run *not* at the time of the closing, but at the time a plaintiff discovered or should have discovered that she had been injured. Finally, plaintiffs contend that the statute of limitations is tolled by defendants' fraudulent concealment of their discriminatory practices.

### 1. *Continuing Violation Theory*

■ In 1982, the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), endorsed a continuing violation theory for the purposes of dealing with the statute of limitations for private lawsuits under the FHA. The plaintiffs in *Havens Realty* accused a real estate firm and one of its agents of illegal racial steering, citing five specific incidents in which black and white testers were directed to homes in different areas. *Id.* at 380, 102 S.Ct. 1114. Although only on of these incidents occurred within the applicable limitations period, the Court held that plaintiffs' claims that defendants' racial steering had "deprived them of the benefits of interracial association arising from living in an integrated neighborhood" were timely, saying:

> [A] 'continuing violation' of the Fair Housing Act should be treated differently from one discrete act of discrimination. Statutes of limitations such as that contained in [the FHA] are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears. [Defendants'] wooden application of [the FHA's statute of limitations], which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act.... [W]e therefore conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.[20]

**20.** The 180–day limitation was later extended to one year for administrative complaints and two years for private lawsuits by the 1988 Fair Housing Amendments Act. 42 U.S.C. § 3613(a)(1)(A). The Act endorses the continuing violation theory by identifying the starting time for the statute of limitations as either when a discriminatory housing practice "occurred" or when it "terminated." *Id.* Indeed, according to the legislative history, the use of the term "termination" was "intended to reaffirm the concept of continuing viola-

*Id.* at 380–81, 102 S.Ct. 1114 (citations omitted). Under the *Havens Realty* theory, plaintiff Austin is challenging not just a single incident of conduct but a continuing policy and practice—namely the discretionary pricing policy which enables racial discriminatory practices, unrelated to creditworthiness—the effects of which she continues to experience.[21]

Countrywide counters by citing to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.,* —— U.S. ——, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007). In *Ledbetter,* the Court considered whether a Title VII plaintiff's pay discrimination claim represented a modified continuing violation, with each unequal paycheck giving rise to a separate claim with its own limitations period, or whether this type of claim challenged the decision that produced the uneven pay, in which case the limitations would run once the discriminatory decisions were made or known to plaintiff. *Id.* at 2167. Ledbetter claimed that earlier in her career, outside of the limitations period, she had received several poor performance evaluations from male supervisors and that as a result her pay had not increased as much as it would have if she had been evaluated fairly. *Id.* at 2165–66. She claimed that each pay check, including those in the limitations period, reflected the past pay decisions. *Id.* The Eleventh Circuit rejected her claim; the Supreme Court agreed.

The Court concluded that the core of Ledbetter's claim was the earlier disparate treatment; she claimed no intentional dis-

crimination continuing into the limitations period. *Id.* at 2169. The Court further concluded that "current effects alone cannot breathe life into prior, uncharged discrimination" and that Ledbetter should have filed after the discriminatory pay decision was made and communicated to her. *Id.* at 2169.

But the instant case is distinguishable for two reasons: First, plaintiff Austin makes a *Havens Realty* type claim, challenging a policy that continues into the limitations period. Second, this is a disparate impact case, where both the challenged policy and its disparate effects likewise continue in the relevant period. As one commentator has noted:

> [T]he distinction drawn by the *Ledbetter* majority between claims attacking a discriminatory pay structure and those addressing decisions specific to an individual employee comports with the purposes served by the modified form of the continuing violations doctrine. A discriminatory pay structure or policy is likely to affect the rights of an evolving class of claimants, in addition to the plaintiff before the court. Therefore, ... permitting challenges to these policies by anyone injured by them within the limitations period—regardless of how long ago a particular policy was instituted, when the plaintiff learned of it, or when the policy was first applied to the plaintiff—eliminates the prospect of repetitive lawsuits directed at the same unlawful conduct.

tions, under which the statute of limitations is measured from the date of the last occurrence of the unlawful practice." Robert G. Schwemm, *Barriers to Accessible Housing: Enforcement Issues in 'Design and Construction' Cases Under the Fair Housing Act,* 40 U. Rich. L.Rev. 753, 841 n. 413 (2006) (quoting H.R.Rep. No. 100–711, 33 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2194).

**21.** It is continuation of the policy that distinguish Austin's claim from the type of "single incident" claim the Court found to be time-barred in *Havens Realty.* 455 U.S. at 381, 102 S.Ct. 1114.

Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L.Rev. 271, 325–326 (2008).

As such, I find that plaintiff Austin's claim is not time-barred.

### 2. *Discovery Rule*

Plaintiffs argue in the alternative that the Court should apply the discovery rule, holding that the limitations period began to run on the date on which plaintiff discovered or should have discovered that she had been injured by the defendants' conduct. The reasons are obvious: This is not a case in which there is a clear injury the moment the papers were signed. Austin, after all, was not turned down for a loan. Thus, she is unlike the "testers" in *Havens Realty*, for example, or a person denied a job or fired, or who has plainly endured an adverse result. Austin received the loan on certain terms; she could not have known that the terms were different and more onerous than those of similarly situated white borrowers. Nor is this a case in which the information necessary to perfect the claim is readily available through plaintiff's diligence. While it is difficult to find out the salary of other employees in a *Ledbetter* type action for pay equity, it is surely more daunting to find out about nationwide patterns of racial disparity in mortgage lending. Nor do we want to enact a rule that forces plaintiff to sue when she first received these loans, presuming, without any basis, that as an African–American woman she was bound to be discriminated against.

Defendant counters by citing the Supreme Court's decision in *TRW, Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). In *Andrews*, the Court held that a discovery rule would not be appropriate unless the statute governing the area of the law "cries out" for application of the discovery rule or otherwise is "silent on the issue" of when the limitations period begins to run. *Id.* at 27, 28, 122 S.Ct. 441. The Court found that the statute at issue in *Andrews*, the Fair Credit Reporting Act ("FCRA"), was not in fact silent on the question. A subsection of the FCRA calls for the application of the rule in action brought under the FCRA, allowing cases to be brought "not later than the earlier of" two years "after the date of discovery by the plaintiff of the violation that is the basis for such liability" or five years "after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. In short, the statute made explicit reference to a discovery rule, and keyed it to a specific statutory limitations period.

There is no comparable mention in either the ECOA or the FHA of a discovery rule. Under the ECOA, the statute of limitations is two years from "the date of the occurrence of the violation." 15 U.S.C. § 1691e(f). The FHA provides that a plaintiff must file a lawsuit within two years after the "occurrence or the termination of an alleged discriminatory housing practice or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). The question is whether these statutes are the functional equivalent of the FCRA—whether by using the word "occurrence" means that Congress necessarily intended to exclude a discovery rule, just as clearly as it did under the FCRA.[22]

---

**22.** In *Skwira v. United States*, 344 F.3d 64 (1st Cir.2003), the relevant statute provided that a tort claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2401(b), must be presented "within two years after such claim accrues." "Accrual" could mean either injury in fact, or when the injury was discovered. As such, the Court concluded that, unlike the FCRA as interpreted by the Supreme Court in *Andrews*, the FTCA had no express provision

Lower courts interpreting the FHA and the ECOA are divided.[23] *Compare Wise ex rel. Wilson v. Union Acceptance Corp.,* 2002 WL 31730920, at *5 (S.D.Ind. November 19, 2002) (applying discovery rule to ECOA), *and Jones v. Citibank Fed. Sav. Bank,* 844 F.Supp. 437, 440–42 (N.D.Ill. 1994) (applying discovery rule to FHA), *with Claybrooks v. Primus Auto. Fin. Servs., Inc.,* 363 F.Supp.2d 969 (M.D.Tenn. 2005) (applying Sixth Circuit rule and finding that the claim accrued on the date when each purchaser signed his or her retail installment contract; statute of limitation not tolled by discovery rule), *and Moseke v. Miller & Smith,* 202 F.Supp.2d 492 (E.D.Va.2002)(discovery rule does not apply to § 3604(f)(3)(C)'s design-and-construction requirements under the FHA).

However, I need not address this issue at this time since I have found that Austin's case fits within a continuing violations framework.

### D. *Fraudulent Concealment*

Though the Court need not reach plaintiffs' fraudulent concealment argument, the Court nonetheless notes that such an argument would fail on the facts as alleged in the complaint.

In order to toll a statute of limitations for fraudulent concealment, a plaintiff must show 1) that defendant engaged in fraud or deliberate concealment of material facts related to her wrongdoing; and 2) that the plaintiff exercised due diligence, but was nonetheless unable to discover the facts. *See Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 101 (1st Cir.199). Allegations of fraudulent concealment must also conform to the requirements of Fed.R.Civ.P. 9(b). *See Varney v. R.J. Reynolds Tobacco Co.,* 118 F.Supp.2d 63, 68 (D.Mass.2000).

Plaintiffs allege generally that Countrywide "spent millions of dollars" to foster an image that its rates were objectively set, knowing that their credit pricing system allowed certain fees and rates to be added based on subjective factors unrelated to creditworthiness.

The allegations in the complaint are simply too vague and to satisfy Rule 9(b). Plaintiffs do not identify what was said in the advertisements; how the comments were fraudulent or misrepresented the actual state of facts; whether Austin relied on these statement, etc. Accordingly, I find that the complaint fails to adequately plead any of these requirements.

## IV. *CONCLUSION*

For the aforementioned reasons, Defendants' Motion to Dismiss (document # 16) is **DENIED**.

**SO ORDERED.**

---

indicating which rule or rules of accrual should apply. It then moved on to examine other laws in which the discovery rule was appropriate. It noted two factors that should instruct courts in deciding whether the discovery rule applies: whether it is possible that the plaintiff would be left without a remedy due to the cause of action arising after the statutory period, and whether the nature of the cause of action relies on knowledge possessed by someone other than the plaintiff. *Id.* at 73.

**23.** *See also, Middlebrook v. City of Bartlett,* 341 F.Supp.2d 950, 956 (W.D.Tenn.2003) (a "federal civil rights claim accrues when a plaintiff knows or has reason to know of the injury that is the basis of the plaintiff's action").